## UNITED STATES v. ADAMS et al.
### No. 4674.

United States Court of Appeals
First Circuit.
Jan. 12, 1953.

John T. Casey, Atty., Dept. of Justice, Washington, D. C. (Holmes Baldridge, Asst. Atty. Gen., J. Frank Staley, Sp. Asst. to Atty. Gen., George F. Garrity, U. S. Atty., and Charles J. Kalinauskas, Asst. U. S. Atty., Boston, Mass., and Joseph A. Tarian, Jr., Atty., U. S. Maritime Administrator, Washington, D. C., on the brief), for appellant.

Seymour P. Edgerton, Boston, Mass. (Charles S. Bolster and Bingham, Dana & Gould, Boston, Mass., on the brief), for appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

These are consolidated appeals from final decrees entered in five libels *in personam* in causes of contract, civil and maritime, brought against the United States under § 2 of the Suits in Admiralty Act, 46 U.S. C.A. § 742. The libels are alike except that different vessels and amounts are involved, and immaterially different dates are set out, in each. It will suffice, therefore, to discuss but one of them, and that will be the libel brought for recovery with respect to the steam collier Glen White.

Certain of the libellants-appellees, as trustees of Eastern Gas and Fuel Associates under a deed of trust (for convenience we shall refer to them collectively hereinafter as Eastern) were the sole owners of the S.S. Glen White on May 17, 1942, when the War Shipping Administration by agreement time-chartered the vessel on behalf of the United States. The United States used the vessel for the carriage of bulk cargoes, the trade in which she had previously engaged,

for its own account until July 1, 1946, when she was redelivered to Eastern. There can be no doubt that the Glen White was employed as a merchant vessel during the period of her operation as above, and, although she may have been laid up at the time the libel was brought, there is nothing to indicate that by that time her character as a merchant vessel had changed. See James Shewan & Sons, Inc. v. United States, 1924, 266 U.S. 108, 45 S.Ct. 45, 69 L.Ed. 192.

The agreement under which the vessel was time-chartered, as amended on June 9, 1944, provided in its clause 11A that the charterer might within certain limitations at its expense and on its time "install any equipment, gear or armament" on the vessel, and that such "defense features" so called, if installed, were to remain the charterer's property and to be maintained at its expense. The above clause of the agreement further provided:

"The Charterer shall, before redelivery and at its expense and on its time, remove any equipment, gear and armament installed by or at the request of the Charterer or any agency of the United States and restore the Vessel to her condition prior to any such installations, alterations, additions or changes, whether such installations, alterations, additions or changes were made under this Charter or prior to delivery under this Charter, except as may be otherwise provided herein."

Then clause 11D of the agreement provided so far as here material that:

"If, at the time of redelivery under this Charter, the Vessel shall require any work * * * for which the Charterer is * * * liable under * * Clause 11A * * * the Charterer may, at its option, discharge such obligations by payment to the Owner in advance of any amount for reconditioning sufficient to provide for such work or repairs, which amount shall also include compensation at the rate of hire that would otherwise have been payable under this Charter, for the time reasonably required under then existing conditions to complete such work for re-

pairs and compensation for other expenses incident to such work or repairs. If the Owner and Charterer agree such obligations may be discharged by a mutually satisfactory agreement."

During the term of the charter certain "defense features," such a gun-tubs and the like, were installed on the Glen White by the United States, and prior to redelivery of the vessel the parties entered into negotiations for the purpose of reaching a "mutually satisfactory agreement" as contemplated in clause 11D, supra, discharging the Government's obligation under the time-charter to remove those features and restore the vessel to her previous condition. These negotiations being in progress on the date of redelivery, the vessel was returned to her owners without removal of the "defense features," and, indeed, they were not thereafter removed by Eastern. Settlement negotiations continued through the summer of 1946, and in September an agreement was reached between Eastern's Vice President in charge of the operation of its vessels, and the Director of the Division of Redelivery of Chartered Vessels of the War Shipping Administration, the duties of which by that time had been taken over by the United States Maritime Commission, whereby the Director offered and the Vice President agreed to accept $19,770 plus 4 days hire amounting to $3,319.72, or a gross of $23,089.72, in full satisfaction of the "charterer's obligations on redelivery to perform repairs, removals, restoration or work" with respect to the vessel.

The Glen White libel was brought to recover the amount agreed upon in settlement of the redelivery claims under the charter with respect to that vessel, plus interest, which it is alleged has never been paid. The other four libels were brought to recover other amounts similarly agreed upon with respect to four other vessels.

■ The District Court's jurisdiction of the libels under the Suits in Admiralty Act is clear. Matson Navigation Co. v. United States, 1932, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336. So also is the jurisdiction of this court over these appeals under Title 28 U.S.C. § 1291.

Assuming the authority of the Director of the Division of Redelivery of Chartered Vessels to settle claims arising under the time-charters covering the vessels here involved, which on convincing data the court below found that he had and which the United States only halfheartedly disputes, proctors for the United States in effect concede that Eastern would be entitled to recover on the facts so far stated. But they say that the liability of the United States under the charters was merged in and satisfied by the sale in August 1946 of the vessels with the "defense features" still on them by Eastern to the United States pursuant to the provisions of the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.Appendix, § 1735 et seq.

There can be no doubt whatever that negotiations between representatives of the parties during the summer of 1946 culminated on August 26 in a formal contract for the purchase by Eastern of certain war-built vessels pursuant to the Merchant Ship Sales Act of 1946, and the trading in on account thereof of the five vessels with which we are here concerned, and others, at valuations to be subsequently fixed under the provisons of the Act. Nor can there be any doubt that the five vessels involved were turned over to the United States soon thereafter with their "defense features" still on board, and that, about a year later, Eastern received notification from the Commission that it had determined trade-in allowances under the Act for the five vessels involved in amounts ranging from $10,000 to $14,000 apiece.

The Government takes the position that these allowances are all that Eastern is entitled to receive for its old vessels because to award in addition thereto the amounts agreed upon for removal of their "defense features" and to restore them to their prior condition would be to confer a gratuitous benefit upon Eastern for the reason that the vessels were turned in without Eastern having spent one cent for the removal of "defense features" and restoration, with the result that such work after turn-in could only be done at Government expense. Furthermore the Government says that Congress in the last sentence of § 8(b)(1) of the act to be considered presently expressly provided that the United States was not to confer such a gratuitous benefit upon shipowners. Eastern, on the other hand, without admitting the adequacy of the trade-in allowances as such,[1] contends that in addition thereto it is entitled to the amounts agreed upon under the time-charters for removal of "defense features" and restoration to previous condition even though it spent nothing for the removal of those features before it turned the vessels in. We agree with the District Court that Eastern's position is sound and the Government's position is unsound.

Under the time-charters Eastern was clearly entitled to the return of its vessels restored to their pre-charter structural state on the charterer's time and at its expense, or to the return of the vessels with their "defense features" on board plus a sum of money considered by the charterer, or agreed upon by the owner and the charterer, as adequate to restore the vessels to their previous structural condition. And the Government concedes that in the latter event Eastern would be entitled under the charters to the amount fixed by the charterer, or the amount agreed upon, for restoration of its vessels without regard to whether Eastern chose to use the money for that purpose or not. Thus, if the money agreed upon for restoration had actually been paid, Eastern could have kept it, leaving the vessels as they were, and when the vessels were traded in they would naturally be valued by the Commission under the Act as vessels not restored, as it is evident the vessels were in fact valued by the Commission. But the amounts agreed upon between Eastern and the United States for restoration of the vessels never was paid, and if, in accordance with the Government's contention, it never is paid, Eastern will obviously be left only with the vessels in their depreciated war-time state, when under the charters Eastern is clearly entitled not only

---

1. Indeed we are told that as to at least some of the vessels involved Eastern is actively disputing the adequacy of the trade-in allowances in proceedings under the Act in the Court of Claims.

to the vessels in that state but also to the amounts agreed upon for their restoration. Thus, to make Eastern whole under the charters, it must be either paid the amounts agreed upon for restoration, which admittedly has not been done, or else credited with those amounts in the transaction in which they were traded in, which obviously has not been done either, for in the case of each vessel the trade-in allowance is less, in some instances much less, than the amount agreed upon by the parties as adequate for its restoration.

Nor is the Government's position supported by the last sentence of § 8(b)(1) of the Act which reads as follows:

"In the case of any vessel tendered in exchange which has been restored to condition by the United States for the purpose of redelivering such vessel to its owner in compliance with the charter of such vessel with the United States, or where, for such restoration a cash allowance has been made to the owner, there shall be deducted from the amount of the allowance of credit for such vessel determined by the Commission under this section, an amount equal to the liability of the United States for such restoration or such cash allowance made to the owner."

This sentence clearly covers the situation arising upon the trade-in of a previously chartered vessel which prior to redelivery has actually been restored to condition at Government expense, and the situation arising upon the trade-in of a previously chartered vessel which has not been reconditioned by the United States, but on account of which a cash payment in lieu of reconditioning has actually been made to the owner by the United States. In both of these situations the cost to the United States for restoration, or the cash allow-

ance actually made to the owner in place of restoration, would have to be deducted from the allowance of credit determined by the Commission for the vessel or else the Government would pay twice for restoration. But the sentence does not cover the situation here presented wherein the vessels traded in were not restored by the United States, and the agreed cash allowance in lieu thereof was not paid but only promised. Nor can the United States draw any comfort from subdivision g5 of General Order 60 of the Maritime Commission quoted in the margin [2] which, if it does not actually lend some support to Eastern's contention in its *proviso*, certainly is no more than a paraphrase and elaboration of the statutory language quoted above.

It seems to us that the Government's argument throughout confuses a payment for restoration actually made with a payment for that purpose only promised, which, of course, is a wholly different matter.

The decrees of the District Court are affirmed; the appellees recover costs on appeals.

---

**2.** (5) In the case of any vessel tendered in exchange which has been restored to condition by the United States for the purpose of redelivering such vessel to its owner in compliance with the charter of such vessel with the United States, or where, for such restoration a cash allowance has been made to the owner, there will be deducted from the amount of the allowance of credit for such vessel determined by the Commission, an amount equal to the cost incurred by the United States for such restoration, including charter hire paid during the period of restoration, or such cash allowance as has been made to the owner, provided that the cost of, or allowance for, removal of national defense features shall not be deducted from the amount of the allowance of credit 46 Code Fed.Regs. § 299.22 (g) (5) (1949).